UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE PROQUEST SECURITIES
LITIGATION,                                              Case No. 06-10619
_____/




**MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.  Introduction                                                          1

II.  Background                                                           1

    A.  General Overview                                          2
    B.  The Parties                                              3
    C.  Relevant Chronology                                      4
    D.  Litigation Procedural History                            7
    E.  The CAC                                                  8

III.  Legal Standards                                                     9

    A.  General Pleading Standards                                9
    B.  Securities Laws/Rules                                     10
        1.  Section 10(b) and Rule 10b-5                      10
        2.  Scienter                                         11
        3.  Section 20(a)                                    13

    C.  The Confidential Informants                               14
        1.  The CIs Allegations                              14
        2.  Analysis                                         15

    D.  In Sum                                                   17

IV.  Hirth's Motion to Strike or Dismiss                                  17

    A.  Motion to Strike                                          17
    B.  Motion to Dismiss                                         18
        1.  Failure to Plead Scienter                        18
        2.  Failure to Allege Hirth as a Control Person       19

VI.  Roemer's Motion to Dismiss                                          20

    A.  Failure to Plead Scienter                                 20
    B.  Failure to Allege an Actionable Misrepresentation         23
    C.  Failure to Allege Control Person Liability                 24

VII.  ProQuest, Aldworth, and Gregory's Motion to Dismiss          25

    A.  Failure to Plead Scienter                                  25
    B.  Failure to Allege an Actionable Misrepresentation          27
    C.  Failure to Allege Control Person Liability                28


VIII.  Conclusion                                                   29

# I. Introduction

This is a securities fraud case. Lead plaintiffs[1] B.V. Brooks and Katheryn Brooks, John L. Maracchi, Herbert R. Albert and Sales Marketing Group, MMP (hereinafter "plaintiffs"), on behalf of themselves and all others similarly situated,[2] are suing defendants ProQuest and certain of its officers, claiming violations of federal securities laws. This is one of several cases before the Court against ProQuest relating to the decline of its stock price following negative corporate news on February 9, 2006 which resulted in an approximate 18% drop in price and continued decline.[3]

Before the Court are motions to dismiss filed by defendants as follows:

> Scott Hirth's Motion to Strike and Dismiss
>
> James Roemer's Motion to Dismiss
>
> ProQuest, Alan Aldworth and Kevin Gregory's Motion to Dismiss

For the reasons that follow, the motions are DENIED.

# II. Background[4]

---

[1]See Stipulation and Order to Consolidate the Related Actions; Appoint Lead Plaintiff; and Approve Lead Plaintiffs' Choice of Co-lead Counsel and Liaison Counsel, filed May 2, 2005.

[2]Although plaintiffs request class action status, no class has been certified.

[3]The Court also has before it two shareholder derivative actions: Fringer v. Aldworth, 06-11845 and Bricker v. Aldworth, 06-15648. In addition, an ERISA class action claiming breach of fiduciary duty was filed by Nicole Vermeylen, Vermeylen v. ProQuest, 06-12327. The Court dismissed the ERISA case under Fed. R. Civ. P. 12(b)(1) because plaintiff lacked standing.

[4]This Background is taken from the First Consolidated Class Action Complaint which, with the exception of allegations from confidential informants, is largely taken from ProQuest's public filings. Indeed, the complaint states that the allegations are based on (1) ProQuest's public filings with the SEC, (2) press releases issued by ProQuest, (3) interviews with former ProQuest employees, (4) public conference calls, (5) media, analyst and news reports about ProQuest, and (6) other publically available

## A.  General Overview

As stated above, this is a securities fraud class action.  It has been brought on behalf of all persons who purchased the publicly traded securities of ProQuest between February 20, 2001 and December 14, 2006 (the Class Period) against ProQuest and certain of its present and former officers and executives for violations of the Securities Exchange Act.  Plaintiffs overall claim that during the Class Period, defendants represented that ProQuest was a company with consistently growing revenues and earnings.  These revenues and earnings, plaintiffs say, however, were materially false and achieve through a variety of improper and fraudulent accounting techniques which resulted in the material overstatement of revenues and material understatement of expenses, thus causing ProQuest's reported earnings to be materially overstated.

data including trading data.

The fact that a plaintiff in a securities fraud case is subject to stringent pleading requirements, yet essentially has only information under the control and made publically available by a defendant in which to plead a securities fraud claim is not lost on the Court.  As one article puts it:

How should a plaintiff with a legitimate securities fraud case proceed in the face of the Reform Act?  Under the new law, the plaintiff will need to plead fraud with particularity without obtaining nonpublic information from the defendants. Undoubtedly, some plaintiffs will be able to satisfy the heightened requirement that they state facts sufficient to establish a strong inference that the defendants acted with scienter–that is, with intent to defraud–without resort to the discovery process.  In most cases, however, only in the unusual circumstance where the defendants have disclosed these facts in their own federal securities filings, or in the course of an ongoing federal investigation, would information sufficient to satisfy the pleading requirements become publically available.  Plaintiffs with potentially legitimate securities fraud grievances who lack sufficient hard evidence will need to look elsewhere to inquire further into potential claims.

Thomas, Randall S. and Martin, Kenneth, J., Using State Inspection Statutes for Discovery in Federal Securities Fraud Actions, 77 B.U. L. Rev. 69, 71 (Feb. 1997).  As the title suggests, the authors advocate that shareholders who are potential plaintiffs in a securities fraud action use state inspection statutes to obtain more information necessary for filing a sustainable securities fraud complaint.

Plaintiffs allege the following:

- defendants falsely represented that ProQuest maintained adequate internal accounting controls.

- After discovering and disclosing "accounting irregularities," defendants falsely and/or misleadingly reported the extent of the errors as being primarily limited to only one of its units.

- the initial disclosures were motivated by ProQuest's desire to sell its Business Solutions unit and to arrange a stock offering at a time in which the stock was overpriced.

- ultimately, all of these actions resulted in the stock being artificially inflated during the Class Period.

## B.  The Parties

ProQuest,[5] based in Ann Arbor, Michigan is a publisher of information based solutions for the education, automotive and power equipment markets.  ProQuest provides services to its customers through two primary business units - ProQuest Information and Learning (PQIL) and ProQuest Business Solutions (PQBS).  The PQIL unit formed the majority of ProQuest's business.  During the pendency of this litigation, ProQuest sold its PQBS division to Snap-On, Inc. and sold its PQIL division to Cambridge Information Group, leaving behind a new ProQuest Education division made up of assets formerly in the PQIL business segment.

---

[5]ProQuest was formerly known as Bell & Howell Co. and traded on the NYSE under the symbol "BHW."  On June 6, 2001, the company changed its name to ProQuest and began trading under the symbol "PQE."

Defendant Alan W. Aldworth (Aldworth) is currently the Chairman of the Board, President and CEO of ProQuest. During the class period, he was named Chairman in May 2004 and CEO in January 2003. He joined ProQuest in October 2000 as Senior VP and CFO and promoted to President and COO in January 2002. He is a Certified Public Accountant.

Defendant Kevin G. Gregory (Gregory) was CFO from April 2002 until November 11, 2005. On May 6, 2005, ProQuest announced that Gregory would "step down as CO by year-end 2005." He resigned as of November 11, 2005. He holds a bachelor's degree in accounting and is also a Certified Public Accountant. He also holds a Juris Doctor and Masters of Law in Taxation degree.

Defendant James P. Roemer (Roemer) is currently a member of the Board of Directors. He previously served as Chairman of the Board until May 2004, when Aldworth took over. He was CEO until January 2003, when Aldworth took over. Prior to the Class Period, Roemer was President from 1995 to 2001.

Defendant Scott Hirth was the VP of Finance and CFO of ProQuest's PQIL unit. Hirth joined ProQuest in 1994. ProQuest terminated his employment in May 2006 in connection with its internal investigation concerning its accounting practices. He holds a Masters of Business Administration degree.

## C. Relevant Chronology

On February 9, 2006, prior to the opening of the market, ProQuest issued a press release entitled "ProQuest Company to Restate Historical Financial Statements." The press release states in part:

> . . . during a review related to its internal controls assessment required by

4

the Sarbanes-Oxley Act of 2002, the company discovered material irregularities in its accounting. As a result, the company intends to restate certain of its previously issued financial statements.

The accounting irregularities that have been identified primarily affect ProQuest's Informant and Learning division . . . .

Based upon its initial findings, the company believes that its deferred income and accrued royalty accounts are materially understated in previously issued financial statements. It also believes that its prepaid royalty account is materially overstated. . . the effect of which will materially reduce earnings from continuing operations for many of the affected periods. . . .

Until the review is complete, the company's previously issued financial statements for fiscal years 1999 through 2004, quarterly periods in 2005, and the company's guidance for fiscal 2005, should no longer be relied upon. In additional the company's review is ongoing and there can be no assurance additional material irregularities or errors will not be identified.

The price of ProQuest's stock declined 18% on heavy trading volume that day.

On March 8, 2006, ProQuest issued another press release titled "ProQuest 10-K Filing for Fiscal 2005 Will be Delayed; Earnings Release Also Delayed Pending Audited 2005 Financials," that stated ProQuest would not file is Form 10-K for fiscal year ended December 2005 within the prescribed time period.

On April 28, 2006, prior to market opening, ProQuest issued another press release, stating in part:

Accounting Restatement Update

ProQuest anticipates its accounting review will result in the restatement of previously reported earnings for fiscal years 2000 to 2004 and for the first three quarters of 2005. . . .

Preliminarily, the company expects to restate earnings from continuing operations by reducing previously reported pre-tax earnings by a total of $35 million to $45 million for the first three quarters of 2005 and by $45 million to $55 million for the full year 2004. Based upon information available to date, the company believes it will also restate earnings for fiscal years 2000 through 2003. . . .

Separately, the company and its independent registered public accounting form are reviewing accounting principles with respect to Information and Learning's revenue recognition for certain one-time sales of published products. . .

The price of ProQuest's stock fell another 28% that day. The next trading day, May 1,

2006, the stock price declined another 22%.

On May 2, 2006, ProQuest announced that the SEC had issued a formal order of investigation in connection with its restatement.

On June 30, 2006, ProQuest issued a press release, stating that the Audit Committee would not complete its investigation by the end of June as previously anticipated.

On July 6, 2006, ProQuest disclosed that on June 29, 2006 it received a letter from KPMG, LLC., ProQuest's auditor, in which KPMG stated that "its opinion on management's assessment and the effectiveness of the Company's internal control over financial reporting as of January 1, 2005, should no longer be relief upon."

On August 1, 2006, during the pendency of this litigation, ProQuest filed an August Form 8-K with the SEC in which it reported the findings of its internal investigation into the accounting improprieties which led to the restatement announcement. The Form 8-K pinned the blame squarely, and almost solely, on Hirth and the PQIL division. It key findings may be summarized as follows:

-       [Hirth] bore primarily responsibility for the Company's for the accounting misstatements
-       [Hirth] exercised primary control over the accounts in which significant misstatements were identified and regularly directed (often without providing appropriate support) that manual journal entries, many of which were erroneous, be made in a number of these accounts, especially during month-end and quarter-end closes,
-       other than with respect to two employees reporting to and acting under the direction of [Hirth], there is no evidence that any other employee, officer, or director, had any direct knowledge of, or involvement in, the accounting misstatements
-       the Company in general and PQIL in particular had certain deficiencies in internal controls that allowed [Hirth] to engage in the misstatements
-       no evidence to indicate undue pressure from corporate management to attain certain results

- intentionally manipulated [the Company's] financial reports in order to inflate PQIL [and, therefore, the Company's] profit or to create the appearance of profitability" and
- the evidence indicated that [Hirth] intentionally manipulated the PQIL financial reports in order to inflate PQIL profits or to create the appearance of profitability and at times made efforts to conceal information from others, including ProQuest's external auditors

On November 28, 2006, ProQuest disclosed that it had completed the sale of its PQBS division to Snap-on, Inc. for approximately $527 million.

On December 15, 2006, ProQuest issued a press release updating on the restatement process. For the first time, ProQuest indicated that accounting problems may exist in other areas that PQIL. The press release states in part:

> . . . the Company has identified additional accounting issues with previously reported results for PQIL and also its ProQuest Education and ProQuest Business Solutions segments which have led to an expansion of the scope of its accounting review.

The press release also reported that ProQuest was selling its PQIL business unit for approximately $222 million. ProQuest's stock again fell another 27%.

At the time the motions were filed, ProQuest has not issued its restatement. However, on August 31, 2007, ProQuest issued a Form 10-K containing its restatement. As seen from the attached Exhibit A, prepared by counsel for plaintiffs, the results of the restatement show that ProQuest overstated its earnings for the period at issue by more than $400 million.

### D. Litigation Procedural History

In total, four securities fraud cases were filed in connection with ProQuest's activities. Beginning just a day after the February 6, 2006 announcement, the first securities fraud complaint was filed by Industry City Associates Employee Pension Plan

Trust Money Purchase U/A 3/10/1986 against ProQuest, Aldworth and Gregory. A similar complaint was filed on February 17, 2006. Yet another complaint was filed on March 16, 2007 and a fourth complaint was filed on April 6, 2006. On May 2, 2006, upon stipulation of the parties, the Court consolidated the four cases, appointed plaintiffs as Lead Plaintiffs, approved plaintiffs' choice of counsel and liaison counsel.

On July 17, 2006, plaintiffs filed a Consolidated Amended Complaint naming ProQuest, Aldworth, Gregory and Roemer as defendants.

On October 19, 2006, following a status conference, the Court entered an order staying further proceedings pending ProQuest's restatement. The Court also said that within 30 days of the restatement, plaintiffs should file an Amended Consolidated Class Action Complaint to which defendants may respond.

On January 27, 2007, although no restatement had issued, plaintiffs filed a First Consolidated Class Action Complaint (CAC). Not surprisingly, the CAC names the same defendants as in previous complaints but adds Hirth. This is the governing complaint to which defendants have filed motions to dismiss.

### E. The CAC

The CAC, which has been described above, runs 193 paragraphs and 68 pages. It chronicles ProQuest's financial results and reporting during the Class Period from December 30, 2000 to October 1, 2005, alleging that all of these statements and SEC filings were false and misleading in light of the disclosed accounting problems. It also alleges that defendants knew or should have known of the accounting problems. As to defendant Roemer, it alleges that he sold his ProQuest stock in suspicious amounts at suspicious times during the Class Period. It also alleges defendants failed to have

adequate financial controls in place which resulted in creation of an environment where the accounting malfeasance could take place.

The CAC also sets forth allegations from two confidential informants, CI 1 and CI 2.[6]

The CAC makes two claims against all defendants, for violation of 10(b)(5) and violation of 20(a) of the Exchange Act.

### III.  Legal Standards

### A.  General Pleading Standards

A motion under Fed. R. Civ. P. 12(b)(6) seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted.   "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief."  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).  To survive a motion to dismiss under Rule 12(b)(6), a "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999)  (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).  "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, ___ U.S. ___, ___, 127

---

[6]ProQuest has filed a motion for sanctions relating to the allegations attributed to CI 1 which is supported by a declaration of the individual believing to be CI 1 in which she denies most of the statements attributed to her.

9

S. Ct. 1955, 1974 (2007).

Notwithstanding the liberal standard required under Rule 12(b)(6), when fraud is alleged Fed. R. Civ. P. 9(b) requires that the allegations "be stated with particularity." The particularity requirement of Rule 9(b) serves three purposes:

> 1) it ensures that allegations are specific enough to inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; 2) it eliminates those complaints filed as a pretext for the discovery of unknown wrongs-a 9(b) claimant must know what his claim is when he files; and 3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.

Bovee, 272 F.3d 356 at 361-62 (6th Cir. 2001)(quoting Vennittilli v. Primerica, Inc., 943 F. Supp. 793, 798 (E.D. Mich.1996)).  Consequently, "[c]onclusory allegations that a defendant's conduct was fraudulent are insufficient."  In re Air Crash Disaster at Detroit Metro. Airport v. Northwest Airlines, Inc., 737 F. Supp. 406, 407 (E.D. Mich.1989); Bovee, 272 F.3d at 361.  "Instead, the complaint must describe the conduct that allegedly constitutes the fraud with some specificity."  Id.  "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud."  Bovee, 272 F.3d at 361.

### B.  Securities Laws/Rules

### 1.  Section 10(b) and Rule 10b-5

Section 10(b), 15 U.S.C. § 78j(b) of the Private Securities Litigation Reform Act (PLSRA) provides that it is unlawful:

> To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

To state a claim for violation of Section 10(b) and Rule 10b-5, a plaintiff must allege: 1) a misrepresentation or omission, 2) of a material fact, 3) made with scienter, 4) justifiably relied on by plaintiff, and 5) proximately causing injury to plaintiff. In re Comshare, Inc. Securities Litigation, 183 F.3d 542, 548 (6th Cir. 1999); In re Federal-Mogul Corp. Securities Litigation, 166 F. Supp. 2d 559, 562 (E.D. Mich. 2001).

"At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utility Co., 228 F.3d 154, 161 (2d Cir. 2000). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)(footnote omitted).

## 2. Scienter

The PSLRA requires a plaintiff suing for securities fraud to state with particularity both the facts constituting the alleged violation and facts supporting a "strong inference" concerning the requisite scienter, 15 U.S.C. § 78u-4(b)(1)-(2), that is, the defendant's

intention "to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193, n. 12 (1976); <u>In re Comshare</u>, 183 F.3d at 548. At the time the parties briefed the motions, the pleading standard for scienter established by the Sixth Circuit in <u>Helwig v. Vencor, Inc.</u>, 251 F.3d 540, 563 (6th Cir. 2001) applied. In <u>Helwig</u>, the Sixth Circuit stated that a strong inference is shown when there is "little room for doubt as to the misconduct." 251 F.3d at 553. The <u>Helwig</u> Court further explained that, for pleading purposes, "[i]nferences must be reasonable and strong-but not irrefutable[,] because "the task of weighing contrary accounts is reserved for the fact finder." <u>Id</u>. But, the plaintiff is only entitled to "the most plausible of competing inferences." <u>Id</u>.

On June 21, 2007, the Supreme Court issued its decision in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S.Ct. 2499, No. 06-484, 2007 WL 1773208 (June 21, 2007) which outlined the requirements for pleading scienter.

One commentator has explained the holding in <u>Tellabs</u> as follows:

> The Supreme Court in <u>Tellabs</u> adopted a "holistic" approach to evaluating a complaint's scienter allegation, and established three "prescriptions" for courts to follow in making such an assessment. First, as has always been the case, "a court must accept all factual allegations in the complaint as true." <u>Id</u>. at *9. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss." <u>Id</u>. Third, "in determining whether the pleaded facts give rise to an inference of scienter, the court must take into account plausible opposing inferences."
>
> The Supreme Court clarified that the inference that the defendant acted with scienter "need not be irrefutable," i.e. of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" <u>Id</u>. However, under this test, a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. <u>Id</u>.
>
> Significantly, the Court in Tellabs again expressly avoiding deciding whether allegations demonstrating recklessness establish scienter. In a footnote, however, the Court noted that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that

the defendant acted intentionally or recklessly[.]" <u>Id</u>. at *7 n. 3.  The Court also decline to address group pleading, but stated that it would not "disturb" that part of the Seventh Circuit's decision that requires a plaintiff to plead scienter as to each defendant.  <u>Id</u>. at * 11 n.6.

With respect to the necessity of motive allegation, the Court emphasized that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that absence of a motive allegation is not fatal." <u>Id</u>. at *11.

Savett, Sherrie R., <u>Plaintiffs' Vision of Securities Litigation: Trends/Strategies in 2005-2007</u>, 41-42, Securities Litigation & Enforcement Institute 2007 (Practising Law Institute N.Y. 2007).

### 3.  Section 20(a)

Section 20(a) of the Exchange Act creates a cause of action for "control person" liability, stating as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Section 20(a) thus establishes two requirements for a finding of control person liability.  First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder.  Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

## C. The Confidential Informants

### 1. The CIs Allegations

As an initial matter, the CAC contains allegations from two confidential informants, noted as CI 1 and CI 2, respectively. As noted above, ProQuest has filed a motion for sanctions on the grounds that it has obtained an affidavit from the individual believed to be CI 1 in which CI 1 recants the allegations based on what she has descried in the CAC. Because the nature of the allegations by the CIs is germane to all defendants, it is appropriate to first deal with what CI 1 has said.

According to the CAC, CI 1 was employed as a Senior Financial Analyst in ProQuest's corporate accounting department at the Company's headquarter's in Ann Arbor from October 2003 through November 2004. CI 1 was responsible for preparing income statement and consolidated earning for ProQuest's various divisions and was intimately involved in preparing various reports including annual and quarterly filings with the SEC, board of director packages and materials for ProQuest's auditor. CI 1 reported to, inter alia, Gregory. Upon resigning in November 2004, CI 1 told ProQuest's Director of Human Resources that CI 1 believed the company was improperly managing earnings and that CI 1's superiors, including Gregory, were wrongfully omitting information from SEC filings. CI 1 also brought these improprites to the attention of her superiors, verbally and in writing, during the Class Period. CI 1 also had frequent conversations with Hirth, who, according to CI 1 acknowledged that the numbers for the PQIL division were wrong. CI - 1 was also present at meetings at which Gregory directed the divisional CFO's to "scrub the numbers" which CI 1 says is a euphemism for manipulating the accounting records. <u>See</u> CAC at ¶ 98-99.

14

CI 2 is a former Financial Analyst employed by ProQuest from July 2003 to early 2005 and was also responsible for preparing monthly accounting, budgeting, and forecasts for ProQuest's various business units, including PQIL.  CI 2 reported to Gregory and others.  Sometime between the middle and end of 2004, ProQuest began using new accounting software, referred to as "GEAC."  CI 2 would receive financial figures from Hirth and noticed consistent discrepancies between Hirth's figures and the figures reflected in the GEAC program.  CI 2 brought this to the attention of Gregory and others; Gregory instructed CI 2 to go with Hirth's numbers.  See CAC at ¶ 100.

## 2.  Analysis

In Higginbotham v. Baxter Intern., Inc., 495 F.3d 753 (7th Cir. 2007), the Court of Appeals for the Seventh Circuit considered the weight to be given to allegations from confidential sources under the PSLRA following the Supreme Court's decision in Tellabs.  The court took a rather jaded view of the relevance of confidential informants, explaining in pertinent part:

> One upshot of the approach that Tellabs announced is that we must discount allegations that the complaint attributes to five "confidential witnesses" . . . It is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.
>  . . .
>  . . . A complaint passes muster under Tellabs "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  That is a higher standard than "probable cause," which (the court stressed in Gates) does not entail a more-likely-than-not threshold.  No decision of which we are aware concludes that anonymous accusers can demonstrate that scienter is "at least as [likely] as any opposing inference one could draw from the facts alleged."
> It is possible to imagine situations in which statements by anonymous sources may corroborate or disambiguate evidence from

15

disclosed sources.  Informants sometimes play this role in applications for
search warrants.  Because it is impossible to anticipate all combinations of
information that may be presented in the future, and because <u>Tellabs</u>
instructs courts to evaluate the allegations in their entirety, we said above
that allegations from "confidential witnesses" must be "discounted" rather
than ignored.  Usually that discount will be steep.  It is unnecessary to say
more today.

495 F.3d at 756-75.  The Court agrees with <u>Higginbotham</u> in that allegations from a

confidential source likely cannot be the <u>sole</u> basis for establishing scienter because,

"anonymity conceals information that its essential to the . . . comparative evaluation

required by <u>Tellabs</u>."  <u>Id</u>.  In that sense, they are to be discounted.  However, that does

not mean that they lack all relevance.  Even the Seventh Circuit says they should not be

ignored.  Rather, to the extent the allegations from a confidential source are consistent

with other allegations, they can further support an inference of scienter.

As to the allegations of CI 1, the Court is constrained to note that ProQuest, in

seeking out and obtaining a declaration from CI 1, engaged in discovery which was

wholly improper.  Plaintiffs have not yet had the opportunity to respond or otherwise

challenge the statements in CI 1's declaration.  Under the lens of <u>Tellabs</u>, the Court

finds that the most appropriate course under the circumstances is to discount, but not

ignore, CI 1's allegations.  But for ProQuest engaging in inappropriate discovery, the

Court would have no contradictory information regarding the allegations in the CAC.

Thus, as to both CI 1 and CI 2, the allegations, to the extent they are consistent with or

otherwise supportive of other evidence of scienter, will be considered.


**D.  In Sum**

With all of the foregoing principles in mind, the Court will consider defendants'
motions.

## IV.  Hirth's Motion to Strike or Dismiss

### A.  Motion to Strike

Hirth first moves to strike certain allegations in the CAC, namely the allegations
which essentially repeat the information contained in the August 1, 2006 8-K report
which are found in paragraphs 10 and 123-125.  As noted above, the 8-K report blames
Hirth for the accounting problems.  Hirth argues that these are untested allegations of a
third party which are immaterial and must be stricken under Fed. R. Civ. P. 12(f),[7] citing
In re CMS Energy Sec. Litig., 2005 U.S. Dist. LEXIS 439 (E.D. Mich. 2005).  In that
case, the district court struck from a securities fraud complaint allegations concerning
unadjudiacated assertions in SEC, CRFTC and FERC proceedings.  Hirth also cites
cases in which district courts struck similar allegations concerning references to steps in
litigations and administrative proceedings in securities fraud actions.

Hirth reasons that since courts have found it improper to include references to
governmental law enforcement and regulatory bodies, it follows that the untested
allegations of ProQuest's Audit Committee contained in the August 1, 2006 8-K report
must likewise be stricken.  The Court disagrees.  As plaintiffs point out, the allegations
pertaining to the 8-K are not being made by third party regulatory or governmental
bodies, such as the SEC, NASD or FERC, nor are they allegations from an

_____

[7]Fed. R. Civ. P. 12(f) provides in part that "the court may order stricken from any
pleading any insufficient defense or any redundant, immaterial, impertinent, or
scandalous matter."

administrative investigation or complaint. Rather, they are from ProQuest's public filings. Moreover, the allegations can hardly be said to be "immaterial" to plaintiffs' claims; they are rather one very key component – that ProQuest initiated an investigation and admitted intentional manipulation of its books occurred to make the company appear more profitable and attributed certain actions directly to Hirth. Thus, there is no basis to strike the allegations relating to the August 1, 2006 8-K.

## B. Motion to Dismiss

### 1. Failure to Plead Scienter

Hirth moves to dismiss the CAC on the grounds that it fails to contain particular facts giving rise to a strong inference of scienter. This argument is not well-taken. First, Hirth says that the "only" allegations as to scienter are those of the confidential informants. This is incorrect. The August 1, 2006 8-K contains more than sufficient information that Hirth acted with the requisite scienter, i.e. a cogent and compelling inference can be made from the statements in the 8-K, namely that there were intentional misstatements, that Hirth acted with the intent to deceive. The 8-K Form says that Hirth "intentionally manipulated" the results of the PQIL business unit (by overstating revenues and understating expenses) to make it appear more profitable, thereby showing an intent to defraud. CAC at ¶ 123-124.

The allegations with respect to CI 2 support the statements in the 8-K and are further evidence of scienter. See CAC at ¶ 100.

Hirth makes much of the fact that accounting errors and financial restatements do not support an inference of scienter. While a restatement alone is not sufficient as a matter of law to support an allegation of scienter, plaintiffs have alleged more than the

fact of a restatement.  Likewise, accounting errors of a large magnitude alone are not sufficient, plaintiffs have alleged that the magnitude of the restatement, is yet another indication of scienter, but not the sole indication.  Finally, the fact that Hirth did not personally gain from the misrepresentations does not negate a finding of scienter. There is no legal requirement that an individual alleged to have committed securities fraud have personally profited by his own conduct.

### 2.  Failure to Plead Hirth as a Control Person

Hirth also says that the CAC is subject to dismissal because plaintiffs have failed to allege that he was a "control" person.  Hirth says that he was a mid-level executive of a subsidiary division of the company and did not have control over the general business affairs.  He also says that the CAC only alleges that he had control over PQIL and that he "directed at least two ProQuest employees to engage in accounting improprieties." CAC at ¶ 193, 124.

Plaintiffs say they have met the pleading requirements because they have alleged a primary violation and that Hirth was a control person.  Plaintiffs point out that the CAC alleges that PQIL generated 63% of ProQuest's revenue for the fiscal year ended January 1, 2005, and that as CFO and VP of Finance for PQIL.  He exercised direct control over the accounts in which material misstatements have now been disclosed by ProQuest.  See CAC at ¶ 191-192.

The Court agrees with plaintiffs.  Specifically, the allegations at ¶¶ 124 (the August 1, 2006 8-K) and 191 -193 adequately allege Hirth's control liability.  Paragraphs 191 - 193 read as follows:

191.    Since the beginning of the Class Period until he became Senior Vice

President of Global Sales in October 2005, defendant Hirth was Vice President of Finance and Chief Financial Officer of the PQIL division. In this position he was responsible for accounting, finance, facilities and information systems of the PQIL division.

192. In particular, Hirth exercised control over accounts in which material misstatements, in part, have now been disclosed by ProQuest. Hirth regularly directed that false and misleading manual journal entries be made in a number of accounts during the month-end and quarter closes, the net effect of which was to improperly increase net income by decreasing expense or increasing revenue and create the appearance of impropriety. These accounting misstatements have required the restatement of ProQuest's financial statements as alleged above.

193. During the Class Period, Hirth directed at least two ProQuest employees to engage in accounting improprieties.

## V. Roemer's Motion to Dismiss

### A. Failure to Plead Scienter

Like Hirth, Roemer also moves for dismissal on the grounds that the CAC fails to adequately allege scienter as to him. Roemer, unlike Hirth, relies heavily on the statements in the August 1, 2006 8-K which implicate Hirth. In particular, Roemer points to the statement in the 8-K that "there is no evidence that any other employee, officer or director of the Company had any direct knowledge of, or involvement in, the accounting misstatements..." CAC at ¶ 124. This argument proves too much. The 8-K does not, as Roemer says expressly contradict plaintiffs allegations that Roemer knew or should have known of the accounting problems. Plaintiffs also point out that the timing of the statement, before it announced that ProQuest had sold part of its business unit and at a time after which Roemer and the other officers were named as defendants, is suspect.

Significantly, plaintiffs allege scienter based on a failure to control or properly

monitor.  That is, Roemer signed SOX (Sarbanes-Oxley) certifications[8] which stated in

part that they 1) had designed controls and procedures to ensure that material

information is "made known to us by others" within ProQuest during the period covered

by the report; 2) had personally evaluated the effectiveness of those controls within the

last 90 days; and 3) any deficiencies in those controls and procedures had been

disclosed in the 10-Q report, as well as to ProQuest's outside auditors and internal audit

committee.  CAC at ¶¶ 51, 55.

Roemer argues that the SOX certifications cannot raise a strong inference of

scienter because they are required and if they were deemed as such, then every

corporate officer would be who signed a certification for a Form 10-Q or 10-K filing that

was later found to be incorrect would be subject to a securities fraud action.  One district

court has rejected such an argument, explaining:

> I do not find this argument persuasive. "When a corporate officer signs a
> document on behalf of the corporation, that signature will be rendered
> meaningless unless the officer believes that the statements in the document are
> true."  Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061 (9 Cir.2000).
> . . .
> . . . the notion that [defendants'] Sarbanes-Oxley certifications should be
> disregarded merely because every CEO and CFO is required to sign one,
> "suggests that [defendants] treated the Sarbanes-Oxley requirements as mere
> boilerplate;" plaintiffs assert that defendants' argument indicates a "fundamental

---

[8]The Sarbanes-Oxley Act provides the following definition of disclosure controls
and procedures:

> Disclosure controls and procedures include, without limitation, controls and
> procedures designed to ensure that information required to be disclosed by an
> issuer in the reports that it files or submits under the Act is accumulated and
> communicated to the issuer's management, including its principal executive and
> principal financial officers, or persons performing similar functions, as appropriate
> to allow timely decisions regarding required disclosures.

SEC Rule 13a-15(e), 17 C.F.R. § 240.13a-15(e), 17 C.F.R. § 240.15d-15(e).

misunderstanding of the purpose and requirements of the Act, which was adopted in response to the unprecedented accounting frauds ... that had been perpetrated in the wake of the adoption of the PSLRA." Plaintiffs argue that the Sarbanes-Oxley certification requirements were expressly intended to prevent top executives from using a "head in the sand" defense to actions for securities fraud committed on their watch, id., citing to a statement by the SEC, warning corporate officers that a "false certification potentially could be subject to ... both Commission and private actions for violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5." Sec. Act Release No. 8124, Pt. II.B.6 (August 29, 2002), 2002 WL 31720215.

Lattice Semiconductor Sec. Lit., 2006 WL 538756, *17-18 (D. Or. Jan. 3, 2006). The Court agrees with the district court in Lattice. The SOX certifications give rise to an inference of Roemer's scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate.

In addition to the SOX certifications, plaintiffs also rely on certain "motive" allegations to establish a compelling inference that Roemer committed fraud. In particular, plaintiffs point to the fact that Roemer sold 100% of his ProQuest stock during the latter half of the Class Period to establish a motive to profit due to insider trading and using the false statements of ProQuest's financial condition to complete a successful secondary offering in which Roemer was able to sell some of his ProQuest shares. Roemer spends a good deal of time arguing that the timing of the stock sales was consistent with prior stock sales, mainly due to exercising stock options and that an inference can be drawn that Roemer's sales were in line with past practice and are indicative of his desire to retire. While one may draw such an inference, one may also draw an inference, which is quite compelling, that the timing of the sales is indicative of scienter. Most notably, Roemer sold his remaining ProQuest stock within a 14 day

period, for a total of over $22 million.  While Roemer says it took 52 separate

transactions to fully divest himself of ProQuest stock, 28 of the 52 transactions occurred

on June 2, 2003 and 13 transactions took place between June 3, 2003 and June 6,

2003.  CAC at ¶ 141-148.  Moreover, Roemer has not fully retired from ProQuest as he

presently serves on the Board of Directors.  Thus, the Court is satisfied that plaintiffs

have adequately plead scienter with respect to Roemer.

### B.  Failure to Allege an Actionable Misrepresentation

Roemer also says that the CAC should be dismissed because it does not allege

any specific facts showing that he made an actionable misrepresentation of material

fact.  In response, plaintiffs cite to several paragraphs of the CAC in which Roemer, or

other defendant officers,[9] made statements about ProQuest's positive financial condition

in press releases (CAC ¶¶ 32,35, 37, 39, 41, 45, 52, 56, 61, 65, 69, 73, 79-80), Form

10Q and Form 10-K filings signed by Roemer (CAC at ¶¶ 32-33, 36, 38, 40, 42-43, 50,

54, 57-58, 75-76, 95), and Roemer's oral statements during an analyst's conference call

on April 18, 2002 (CAC at ¶ 46) which in light of the disclosure of accounting problems,

were false.  Roemer, however, says that he personally made only one statement in a

July 18, 2001 press release in which he described ProQuest as "a focused, growing,

highly profitable and predictable enterprise – easy to follow and understand for our

investors, and easy to do business with for our customers."  CAC at ¶ 37.  Roemer says

that this statement is mere "corporate puffery" which cannot form the basis for a

---

[9]The parties spend a good deal of time discussing whether the "group pleading" doctrine applies after the PLSRA.  The Sixth Circuit has not addressed the issue, and the circuits are split on the issue.  See D.E. & J. Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719, 730-32 (E.D. Mich. 2003)(Rosen, J.).

securities fraud misstatement.

Roemer's arguments really go to challenging the substance of the statements, not whether plaintiffs have actually plead that he made false statements. Plaintiffs have identified several statements which they say are false and are misrepresentations. The complaint is not subject to dismissal on these grounds.

## C. Failure to Allege Control Person Liability

Finally, Roemer says that the complaint should be dismissed because it does not properly plead a section 20(a) violation, i.e. that Roemer had the control or intent necessary for section 20(a) liability. Having found that plaintiffs have stated an actionable primary violation, the question is whether they have alleged the requisite control. The CAC contains the following allegations regarding Roemer's control:

23. As Chairman and CEO of ProQuest during the Class Period and as a member of the Company's Board, defendant Roemer held the most senior executive positions at the Company

25. Defendant Roemer controlled the contents of the Company's SEC filings, corporate reports and press releases, and participated in writing or reviewing ProQuest's corporate report, press releases, and SEC filings that the complaint alleges are misleading.

- Roemer signed various quarterly and annual filings with the SEC made by ProQuest and the [SOX] certifications contained therein. SAC at ¶¶ 54-55, 57-58

- Defendant Hirth, who is alleged to have intentionally manipulated the Company's records to understate expenses and/or overstate revenues, reported directly and/or indirectly to defendant Roemer. SAC at ¶¶ 184, 187, 190.

Roemer makes much of the fact that elsewhere in the CAC plaintiffs allege that Hirth reported to Gregory (SAC at ¶ 24). That alone does not militate a finding that Roemer was not a control person. Overall, the above allegations are sufficient to plead a section 20(a) violation as to Roemer.

## VI.  ProQuest, Aldworth, and Gregory's Motion to Dismiss

ProQuest, Aldworth, and Gregory have filed a motion to dismiss, raising essentially the same arguments as in Roemer's motion, i.e. lack of scienter, failure to plead actionable misrepresentations, and failure to plead a section 20(a) claim.

## A.  Failure to Plead Scienter

They say that plaintiffs fail to meet the pleading standard for scienter because they have failed to allege any circumstantial evidence, such as reports, documents, meetings, or competent witnesses which would support an inference of scienter, i.e. that defendants knew ProQuest's statements were false or misleading at the time they were made.  Defendants say that plaintiffs attempt to allege scienter only (1) by the fact of the restatement itself, (2) generalized allegations that defendants "must have known" the financial statements were false by virtue of their positions with ProQuest, and (3) vague and irrelevant statement from two CI, one of whom now denies the statements attributed to her in the CAC.

In response, plaintiffs point to the August 1, 2006 8-K which says that the expected restatement is the result of intentional fraud at ProQuest and is more than enough to assert that Hirth, and therefore ProQuest, had actual knowledge of the accounting fraud and Aldworth and Gregory, at a minimum, recklessly disregarded the fraud.  Moreover, the 8-K does not absolve Aldworth, Gregory or ProQuest of any involvement; it simply says the investigation did not reveal that they had any direct knowledge of the accounting fraud.  This does not preclude an inference of indirect knowledge or involvement, or even recklessness.

Plaintiffs also point to other allegations of scienter which they say when taken

together supports an inference of scienter.  Such evidence includes:  (1) the magnitude of the expected restatement, as ProQuest has admitted that it overstated its reported earnings by a range of at least 64%-69% for 2004 and the first three quarters of 2005 (we now know that the actual restatement shows even higher overstatements); (2) the substantial divergence between the reported financials and the anticipated actual financials; (3) the SOX certifications, signed by Gregory and Aldworth, attesting to internal accounting controls; (4) the GAAP violations at issue are of the type that are so simple, basic and pervasive in nature and so great in magnitude that they should have been obvious to defendants, which is particularly so given that Aldworth and Gregory are Certified Public Accountants; (4) lack of internal controls as evidenced by the investigation statement that "in general and PQIL in particular had certain deficiencies in internal controls that allowed the former PQIL VP Finance to engage in misstatements (CAC ¶ 124); (5) that the admitted accounting fraud took place in ProQuest's core (main) business; (6) motive - Aldworth was motivated to indicate that the fraud was limited to PQIL in order to sell the PQBS unit only to announce less than two months after the sale that the accounting was not limited to PQIL but would also include PQBS (CAC ¶ 153) - Aldworth and Gregory were motivated to misstate the financials in order to inflate the stock price to achieve a successful secondary offering (CAC ¶ 149-150).

Plaintiffs also make specific allegations against Gregory, via the CI.  CI 2 worked in the accounting department and reported to Gregory, among others.  CAC ¶ 100. They also worked directly with Hirth, from whom they received financial information.  CI 2 describes a conversation with Gregory in which he instructed CI 2 to disregard the company's accounting software and go with "Scott's numbers" even if there were

discrepancies. CAC ¶ 100. While these allegations alone are not sufficient to show scienter, they are consistent with the other allegations and therefore support a finding of scienter.

The most significant evidence of scienter, in the Court's view, is not from the CI, but rather from the SOX certifications, discussed in detail above with respect to Roemer. Aldworth and Gregory cannot have it both ways. They cannot say that the SOX certifications concerning knowledge of and adequacy of internal controls were truthful, yet, at the same time claim that the controls were so deficient that one "rogue" employee could single-handedly be the cause of all the company's accounting problems. Overall, the Court is satisfied that plaintiffs have alleged scienter against the company, Aldworth, and Gregory in taking all of the allegations together, not singularly or in isolation as defendants urge, there is a compelling inference of fraud.

### B. Failure to Allege an Actionable Misrepresentation

ProQuest, Aldworth and Gregory also argue that plaintiffs have not plead any actionable misrepresentations. Plaintiffs again respond with reference to paragraphs in the CAC in which they allege statements made by Aldworth and Gregory were false or misleading. They appear in the form of (1) written and oral communications of the Company's annual and quarterly financial results for 2000-2004, and the first three quarters of 2005, including press releases, (2) SOX certifications signed by Aldworth and Gregory, and (3) statements in public announcements by Aldworth.

Defendants argue that many of the alleged statements are corporate puffery which is protected and contain that cautionary language used after the discovery of the accounting problems protects the statements from liability as forward-looking

27

statements under the PSLRA's "safe harbor" provisions. Plaintiffs, of course, deny such protection is warranted and note that at least one forward looking statement, that only PQIL was affected by the accounting problems, turned out to be incorrect.

As with the allegations as to Hirth and Roemer, plaintiff have made specific factual allegations of alleged misstatements which are actionable.

## C. Failure to Allege Control Person Liability

Having concluded that plaintiffs have alleged a 10(b) claim against ProQuest, Aldworth, and Gregory, the 20(a) claim is not subject to dismissal, as they urge, on the ground that plaintiffs have failed make out a primary violation. Rather, the Court must consider whether plaintiffs have alleged sufficient control liability to state a claim under 20(a).

Plaintiffs make the following allegations regarding defendants' control:

- Defendants held the most senior executive positions at ProQuest: Aldworth was CEO and Chairman of the Company during the Class Period and had served as the Company's CFO and COO (CAC ¶ 21) and Gregory was ProQuest's CFO (CAC ¶ 22)

- Aldworth and Gregory each controlled the contents of the Company's SEC filings, corporate reports and press releases, and participated in writing or reviewing ProQuest's corporate reports, press releases, and SEC filings that the [CAC] alleges are misleading (CAC ¶ 25)

- Aldworth and Gregory each signed various quarterly and annual filings with the SEC made by ProQuest, and the [SOX] certifications contained therein (CAC ¶¶ 183, 1986, 198)

- Hirth, who is alleged to have intentionally manipulated the Company's records to understate expenses and/or overstate revenues, reported directly and/or indirectly to Aldworth and Gregory (CAC ¶ 184, 187, 190).

Like the allegations with respect to Roemer, they are sufficient to allege that Aldworth

and Gregory are liable as control persons under section 20(a).[10]

## VII. Conclusion

Deciding a motion to dismiss in a securities fraud action is an exercise in logic because the Court must look at allegations in a complaint and infer from those facts that a plaintiff has adequately alleged the rather elusive notion of scienter. As one court put it, an "[i]nference is the process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted." Computer Identics Corp. v. S. Pacific Co., 756 F.2d 200, 204 (1st Cir. 1985). This is not an easy task. First, as noted above, the plaintiffs essentially have only the facts made public by the defendant. From these facts, inferences must be drawn as to the culpability of a defendant. This is problematic because (1) defendants control the disclosure of facts to the public, and (2) no defendant will likely admit scienter or publically disclose information which would raise an inference of scienter (although ProQuest in this case essentially acknowledged scienter as to Hirth).

All of this is exacerbated by the stringent pleading standard required by the PLSRA. The analysis required, particularly with respect to pleading scienter, is akin to holding a mini-trial on the merits of the case based only on the complaint. This poses a great difficulty in resolving a motion to dismiss and letting the case go forward.

---

[10]Defendants argue that the CAC must be dismissed because plaintiffs failed to allege "culpable participation" to state a claim under section 20(a). This argument is misguided. The Sixth Circuit has not held that culpable participation is an element of a section 20(a) claim. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 696 (6th Cir. 2004)

As applied to this case, at best defendants say that ProQuest's accounting problems are the result of Hirth's actions of which they had no knowledge. Hirth says he is the corporate scapegoat. Contrary to defendants' arguments to the contrary, the accounting issues described in the CAC have not been definitively confined to PQIL under Hirth's control. The allegations in the CAC are sufficient to put in issue whether ProQuest lacked the internal controls to prevent such actions although they made representations to the contrary. They also describe a high level of recklessness in alleging that defendants knew or should have known of accounting irregularities in the exercise of reasonable care. What is clear is that something at ProQuest went very awry which has resulted in a massive restatement.

In denying defendants' motions, the Court's decision is limited to a finding that the CAC sufficiently pleads securities fraud violations under 10(b) and 20(a) to require defendants to answer and the case go forward. In that sense, plaintiffs have crossed one of many hurdles required in order to succeed in a securities fraud class action. Yet to be determined is whether the allegations of the CAC will survive for trial and if they do, whether or not they can be established at trial.

SO ORDERED.


Dated:  November 6, 2007              s/Avern Cohn                                    
                                      AVERN COHN
                                      UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 6, 2007, by electronic and/or ordinary mail.

                                      s/Julie Owens                              
                                      Case Manager, (313) 234-5160